## 64364. WIREMAN et al. v. THE STATE.

QUILLIAN, Chief Judge.

The defendants, James Wireman and Thomas Yinger, were indicted with Ode Little, Steve Little, Mike Scott, and Edgar Allen, and all were charged with conspiring to violate the Georgia Controlled Substances Act. Ode Little, Steve Little, and Mike Scott were convicted of conspiring to sell five pounds of methaqualone tablets and this Court's decision on appeal of that conviction is found at 157 Ga. App. 462 (278 SE2d 17). The defendants in the instant case were charged with possession of approximately 180 pounds of marijuana with intent to distribute.

The prosecution of all defendants was based primarily on two electronic surveillance investigative warrants issued by the Superior Court of Cobb County. The first investigative warrant will be referred to as the "Phillips" warrant and the second investigative warrant will be called the "Little" warrant. In *Little v. State,* 157 Ga. App. 462 (4), (6), supra, this Court found both the "Phillips" and the "Little" investigative warrants were properly issued on the basis of probable cause and that the "Phillips" warrant was not overly broad. The electronic surveillance in the "Phillips" wiretap led to the discovery of probable cause for the issuance of the "Little" wiretap, and the electronic and physical surveillance in the "Little" wiretap led to the detection and apprehension of the defendants in the present case. Tapes of the intercepted communications under the "Little" wiretap provided the probable cause for the arrest of the defendants who were then in possession of approximately 125 pounds of marijuana. Defendants bring this appeal from their conviction for conspiracy to violate the Georgia Controlled Substances Act. *Held:*

1. Defendants' first five enumerated errors were decided adversely to them by this Court in *Little v. State,* 157 Ga. App. 462, supra.

2. Enumerated errors 6 through 20 complain of admission in evidence of electronically intercepted telephone calls in the "Little" wiretap. The basis for appeal cited in each enumeration was that "it was error" for the trial court to permit the jury to hear these calls. The ground urged at trial and in the brief is that some of the calls did not involve either of the defendants, while other calls did not discuss any offense charged against the accused. In essence, defendant's objections related to relevancy and materiality of the intercepts to prove any issue in the case.

The question of the existence of a conspiracy is for the jury to decide. *Hurt v. State,* 239 Ga. 665, 673 (238 SE2d 542). And the existence of a common design or purpose between alleged

conspirators may be shown either by direct or circumstantial evidence. *Birt v. State,* 236 Ga. 815, 823 (225 SE2d 248). Thus, conspiracy may be shown by conduct as well as by direct proof or express agreement, by inference as well as deduction from conduct which shows common design on the part of persons charged to act together for the accomplishment of the unlawful purpose. *Townsend v. State,* 141 Ga. App. 743, 744 (234 SE2d 368); *Harris v. State,* 184 Ga. 382, 392 (191 SE 439). Further, "[a]fter the fact of conspiracy shall be proved the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." Code Ann. § 38-306 (Code § 38-306); *Reaves v. State,* 242 Ga. 542, 547 (250 SE2d 376). " 'The rule is that so long as the conspiracy to conceal the fact that a crime has been committed or the identity of the perpetrators of the offense continues, the parties to such conspiracy are to be considered so much a unit that the declarations of either are admissible against the other.' " *Moore v. State,* 240 Ga. 807, 818 (243 SE2d 1).

Against this background, we consider the admissibility of the intercepted calls. The objection to Call 137 was that it involved Ode Little and an unknown "white/male," not discussing any offense involving these defendants. The call showed that "City Motors" in Marietta was a front for criminal activity and dealt with sale and purchase of controlled substances by one of the co-defendants. Call 159 involved Steve Little talking to Mike Scott. Both were alleged co-conspirators. Little referred to that "ole son-of-a-bitch from up yonder [referring to Wireman] was supposed to be back up here today . . . I told him to bring me 120 things. He said he had 180 but when he gets here I'm gonna take about $900.00 worth of it. Yeah, I'd rather have $900.00 of it than not [sic] nothing." This intercept shows the beginning of the conspiracy. Other intercepted calls showed Wireman had called Little from either Michigan or Indiana with news that he had 100 pounds of "gold" (Columbian marijuana) and 80 pounds of "green" (Mexican or homegrown marijuana). Call 174 was an intercept in which the dialed telephone did not answer, but after City Motor's phone was taken off the hook, Ode Little was heard to say: "Well, this year is supposed to be the best year for that. This is the third year. A hundred and eighty. I don't know. Steve's gonna get his money's worth out of it, I guess. Wireman. He said he'd be here sometime tomorrow . . ." This call had been made at 7:08 p.m. on September 5, 1979. On the following day, at 10:35 a.m., September 6, Call 174 was intercepted from defendant Wireman to City Motors. Wireman advised Little he was "back" and in Room 205 at the Scottish Inn in Marietta.

Call 256 involved an intercept from Steve Little and his wife

Becky in which she had been sent to the home of Mike Scott to pick up some drugs. The Scotts didn't have all they wanted. Becky said: "I can only do six." Steve asked her to "[b]ring me an extra one of some other kind. BECKY: Some black ones . . . STEVE: Just bring me them." This shows a continuing drug conspiracy involving one of the indicted co-defendants. Call 284, like many of the intercepted calls, is not a model of clarity because of the conspirators use of code, slang, and reference to other communication not intercepted by the police. In Call 284, Steve Little told Mike Scott that his daddy (Ode Little) "let him have fifty pounds of that pot and then brought the money back for it . . ." Mike asked: "I thought that old guy that sold the grass wanted that. STEVE: Huh? Well, that is him. MIKE: He ain't got the damn money." The "old guy" could have referred to Wireman, and it turned out that Little could not come up with the money to purchase the 180 pounds of marijuana Wireman was attempting to sell. Subsequent calls from Wireman advised Little that he had moved to the Holiday Inn in Room 568 and asked: "You got any prospects or what?" Another call involved a drug arrest by police of a person carrying 10 pounds of marijuana for Little. Ode Little was asked if he had "any good" and told the caller "[t]hat was all of it." He was asked: "Well, did you get that from Chico?" "Chico" was the nickname for Wireman. Little was then asked: "Didn't he [Chico] have some. ODE: Hell, he's still sitting over there with it - 180." Because Little could not raise the money for the purchase, a subsequent call between Steve Little and Mike Scott revealed that "he" (Wireman) "said he'd trade you $2,500 worth of that stuff for [Scott's Cadillac]."

Wireman was from Indiana. "STEVE: You mean Indiana? MIKE: Yeah. STEVE: Oh well he wanted it but he ain't got no money. MIKE: Ain't he one that's got that stuff? STEVE: Yeah . . . He's got 100 that's gold looking and 100 ah . . . eighty that ain't . . . He said if they sold that stuff he said he'd come back and buy that Cadillac and pay us."

Suffice it to say that the intercepted calls showed violations of the Georgia Controlled Substances Act, association of the conspirators, subject matter of drugs, and more specifically a conspiracy to sell and to buy 180 pounds of marijuana. Some calls lacked relevance except they provided background for later relevant calls. When the defendants left their motel with their personal things and then departed City Motors without consummating the sale and headed north on Interstate 75, the police made a stop under a fugitive warrant for the arrest of Wireman from Michigan. A search of the trunk of the car revealed 125 pounds of marijuana.

Enumerations of error 17 through 20 involved intercepted calls subsequent to the defendants' arrest in which Wireman called Ode

Little from the jail to get them a lawyer. Ode called a Marietta lawyer and stated: "This is Ode Little . . . I got a boy out there in jail, Cobb County . . . He got busted up here Saturday, 100 and something pounds of grass." The remaining calls were to ensure a lawyer had been found, asking help for making bond, and attempting to determine how they had been caught and if anyone turned them in to the police. We find these calls to reasonably relate to the conspiracy, to its continued suppression of the identities of the remaining conspirators, during the pendency of the conspiracy. See *Jackson v. State,* 225 Ga. 39 (4) (165 SE2d 711); *Hutchins v. State,* 229 Ga. 804 (1) (194 SE2d 442); *Birt v. State,* 236 Ga. 815 (1), supra.

The admission of evidence is a matter that rests largely within the discretion of the trial court. *Baker v. State,* 246 Ga. 317, 319 (271 SE2d 360). And, if evidence has a tendency to establish a fact in issue, that is sufficient to make it relevant and admissible. *Alexander v. State,* 239 Ga. 108, 110 (236 SE2d 83). Thus, questions of relevancy are for the court, and where facts are such that the jury, if permitted to hear them, may or may not make an inference pertinent to the issues, in connection with other facts in evidence, then the jury ought to be permitted to hear them. *Ball v. State,* 145 Ga. App. 254 (243 SE2d 672). The Georgia rule favors admission of any relevant evidence no matter how slight its probative value. Agnor's Ga. Evidence, 165, § 10-2. Further, admission of irrelevant evidence is not ground for reversal unless the defendant can show how the evidence was prejudicial to him. Defendant has shown no prejudice. We find no merit to these enumerations.

3. It is alleged that the issuance of the "Little" wiretap was without probable cause and that all other types of investigative procedures had not been tried before resort was had to electronic surveillance. The "probable cause" for issuance of the "Little" wiretap warrant was decided in *Little v. State,* 157 Ga. App. 462, 465, supra. We also find little merit in the claim that the court erred in issuing the "Little" wiretap warrant without requiring the police to exhaust other investigative techniques.

We note that the police did use undercover officers in an attempt to penetrate the "Phillips" conspiracy and used physical surveillance lasting three days on City Motors in the instant case and observed most people going directly to the office and then back to their cars rather than looking at cars for sale. One individual in a Cadillac went directly to the office and emerged with a brown paper sack and returned to his car. He produced a large roll of money and "peeled" off a substantial amount and paid it to Ode Little. A check of the Cadillac license plates revealed it did not belong to that car. Known drug users were seen to frequent the City Motors premises.

In his affidavit for the wiretap the officer stated that "[o]ther investigative procedures have been tried and failed" and "[b]ecause of the secrecy with which [defendants] conduct such enterprises, other investigative procedures reasonably appear to be unlikely to succeed." It was stated that the defendants sold only to people known to them. Our Supreme Court has held that State and Federal statutes requiring use of other investigative techniques are " 'simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' [Cits.] Their purpose 'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.' " *Lawson v. State,* 236 Ga. 770, 771 (225 SE2d 258). Accord, *State v. Bilbo,* 240 Ga. 601, 602 (242 SE2d 21).

The State is entitled to make these conclusory allegations in the warrant application as they are couched in the terms of the statute and show compliance with the statute. In addition, "the trial court was authorized to rely upon these representations." *Lawson v. State,* 236 Ga. 770 at 771, supra; *State v. Bilbo,* 240 Ga. 601 at 602, supra. This enumeration is without merit.

4. Defendant's twenty-second enumeration of error argues that there was a lack of "probable cause for the stop and arrest of the Defendants . . ." The "stop and arrest" of Wireman was based on a fugitive warrant from Michigan. The "stop and arrest" of Yinger was based on probable cause to believe that both defendants had conspired to sell 180 pounds of marijuana. We find the evidence cited above supports a finding of probable cause to believe both defendants were conspiring to sell marijuana and justified their arrest. *Bradford v. State,* 149 Ga. App. 839, 840-841 (256 SE2d 84).

5. It is alleged the trial court erred by refusing to give the defendant's requested charge relating to withdrawal from the conspiracy by defendant Yinger. We do not agree. The requested charge was made under Code Ann. § 26-3202 (CCG § 26-3202; Ga. L. 1968, pp. 1249, 1335; 1969, pp. 857, 867), which provides: "A co-conspirator may be relieved from the effects of this Chapter if he can show that before the overt act occurred, he withdrew from his agreement to commit a crime."

The indictment charged seven specific overt acts in furtherance of the alleged conspiracy. It was alleged that the first overt act occurred on September 5, 1979, that the second and third acts occurred on September 6, 1979, that the fourth and fifth acts

occurred on September 7, 1979, and the sixth and seventh acts were on September 10, 1979. Defendant Yinger testified: ". . . it was later on that day, [September] the 8th, an hour or so prior to the day — the time that they arrested us, I had found out that drugs were involved, specifically marijuana. Q. Alright, sir. Based on what you found out, what did you all decide to do? YINGER: Well, I made the decision, since it was my automobile, and it was rented in my name, and the responsibilities that I have, I told them that, 'Let's get the hell out of here,' was my exact words."

First, it is arguable that such evidence is not a withdrawal from the conspiracy but only an attempt to avoid detection or apprehension and it does not negate the fact that the conspiracy could have continued for the purpose of sale of the marijuana then in their possession. See *Walls v. State,* 148 Ga. App. 112 (2) (251 SE2d 103); 22A CJS 1168, Criminal Law, § 772.

Secondly, the defendant would not be entitled to the defense afforded by Code Ann. § 26-3202, since by his own testimony he never participated in the conspiracy, therefore, could not withdraw. *Caldwell v. State,* 142 Ga. App. 831 (1) (237 SE2d 452); *Walls v. State,* 148 Ga. App. 112 (2), supra.

Last, but by no means the least reason, defendant contended he withdrew from the conspiracy that he never knew about, approximately one hour before he was arrested on September 8, 1979. Five of the overt acts alleged in the indictment had already occurred and the conspiracy was complete. The statute permits withdrawal only before an "overt" act occurs which completes the conspiracy. *Sak v. State,* 129 Ga. App. 301 (199 SE2d 628). The purported withdrawal came too late. We find no error in the refusal of the trial court to give the requested charge.

*Judgment affirmed. Shulman, P. J., and Carley, J., concur.*

DECIDED SEPTEMBER 10, 1982.

*Jimmy D. Berry, Harris P. Baskin, Jr.,* for appellants.
*Thomas J. Charron, District Attorney, Joe Chambers, Assistant District Attorney,* for appellee.