### 70369. BROWN v. THE STATE.
(339 SE2d 332)

BEASLEY, Judge.

Nancy S. Brown was indicted, convicted by a jury, and sentenced for the offense of conspiracy to defraud the State. She appeals from the judgment and from the overruling of her motion for new trial.

1. Defendant claims that the repetitive nature of the charge directing the jury to reach a verdict, especially since it did not remind the jurors not to surrender conscientiously held minority opinions constituted undue pressure or coercion on the jury. If she is correct,

the fairness of her trial could have been infected. *Anderson v. State*, 247 Ga. 397, 401 (3) (276 SE2d 603) (1981).

The trial began on March 7, 1984, and was submitted to the jury for consideration eight days later on Thursday evening, March 15.

Near the conclusion of the charge, the court gave the usual counsel on how to conduct their deliberations and deal with differences of opinion and included the following: "Though a juror should not hesitate to change his or her vote when his or her reason and judgment are changed, each juror should vote according to his or her honest judgment, applying the law from the instructions to the facts as proved. It is your duty as jurors to discuss openly with each other and to consult with one another and to deliberate with a view toward reaching a verdict one way or the other, if you can do so consistent with your individual judgments." The jurors were sequestered for the night after approximately two hours. Deliberations resumed the following morning, after the substitution of an alternate for a sick juror, and continued until late afternoon, when the trial court summoned the jurors and gave an "Allen"-type charge. See *Allen v. United States*, 164 U. S. 492 (17 SC 154, 41 LE 528) (1896). The charge given by the court was substantively identical to one which has met with approval. See *Spaulding v. State*, 232 Ga. 411, 413 (4) (207 SE2d 43) (1974). Upon inquiry by the court, both counsel responded that there were no objections.

More than an hour later, the court received a communication from the jury foreman: "The jury is hung and would like a point clarified on the charge of the court. . . ." Deliberations resumed after the court gave the further instruction and continued until about 6:30 p.m., when the jury was once more sequestered for the evening.

On Saturday morning, the court greeted the jurors: "Good morning. This morning we'll resume the trial for which you were impaneled to serve as a jury. I want to point out to you that no better jury would be better qualified to try this case than you now impaneled. I suggest that you go back to the jury room and reason together. I suggest that you review again the evidence together and make every possible effort to reach a verdict which you in good conscience, can subscribe to in your own mind. Return to the jury room and resume your efforts and try every effort to reach a verdict that you, ladies and gentlemen, can subscribe as your own. If you will go back to the jury room at this time, we'll send back the evidence to you in just a moment. . . ."

Subsequently, the jury returned its verdict of guilty.

First, appellant's characterization of the objected-to morning greeting to the jury as being a full-fledged "Allen" charge is dubious. In the context of the chronology and circumstances of the proceeding, it appears to be little more than a reminder to the jury of its general duty and the prior instruction. Assuming it was a second "Allen"

charge, we find no abuse either in its content or in its giving.

The decision of whether to give a jury in disagreement such a charge, including deciding the length of time a jury may be allowed or required to deliberate before the charge is given, generally lies within the discretion of the trial court and will not be disturbed on appeal unless there is a manifest abuse of that discretion. *Bankston v. State*, 169 Ga. App. 955, 956, 957 (2) (315 SE2d 671) (1984).

"The issue in reviewing such charge is whether the instruction is coercive so as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." *McMillan v. State*, 253 Ga. 520, 523 (4) (322 SE2d 278) (1984).

The fact of repetition, standing alone, would not render the charge coercive. While we have not uncovered a criminal case on that point, we recently found no abuse of discretion in the giving of a second "Allen" charge in a civil case. *Georgia Communications Corps. v. Horne*, 174 Ga. App. 69, 70 (4) (329 SE2d 192) (1985).

We find the court's morning instruction which is the only one complained about, not to be impermissibly coercive either alone or, when considered with the earlier charges, to the degree it was repetitive. Encouraging the jury to reach a verdict if it could, as a way of opening the proceedings on a new day of deliberations for a physically and mentally refreshed jury, cannot be said here to have restricted the freedom of the jury nor borne upon the minds of the jurors so as to induce a decision contrary to the conscience of each. It simply was not of such character. Compare *Sanders v. State*, 162 Ga. App. 175 (290 SE2d 516) (1982).

2. Appellant next maintains that the trial court erred "in charging the jury that they could find venue in Fulton County if the defendant committed *any* crime therein."

Brown complains of a part of the court's charge on venue during its reinstruction to the jury. This was a virtual repetition of what had been initially charged, to which general charge and recharge she reserved objections.

Appellant contends that as reinstructed, the jury in effect was improperly instructed that venue could be found upon *any* overt act committed by a co-conspirator in Fulton County, and that no provision of law allows the jury to convict on a conspiracy case by proof that the defendant committed *any* crime within the county.

The reinstruction on venue was: "Another of the things the State must prove to your satisfaction and beyond a reasonable doubt with regard to the defendant is that the offense charged was committed in Fulton County. With reference to this requirement, you must find either the defendant was personally within Fulton County when she committed any crime, or that although not personally within the

county, she aided, abetted, encouraged or conspired to commit those acts which were committed in Fulton County. Where individuals enter into a conspiracy to commit a crime, the actual perpetration by one or more of those persons in furtherance of that conspiracy is, under the law, the act of each of them, regardless of their presence or absence at the time it is committed. Therefore, if you find a conspiracy as I have defined it elsewhere in this charge to have existed, and if you find that any overt act in furtherance of that conspiracy occurred in Fulton County, you would be authorized to find that the defendant is criminally responsible in Fulton County."

A court's charge must be read as a whole in determining whether it contained error. *Wood v. State*, 243 Ga. 273, 274 (2) (253 SE2d 751) (1979). Venue in a conspiracy prosecution is properly laid either in the jurisdiction where the conspiracy was formed or in any jurisdiction wherein a conspirator committed an overt act in furtherance of the conspiracy. *Jones v. State*, 135 Ga. App. 893, 899 (7) (219 SE2d 585) (1975). We do not find that the court's charge taken as a whole could have misled or confused the jury. The total charge clearly does not permit the jury to find venue based on just any crime which may have been committed by Brown in Fulton County or that it was allowed to find venue even if no overt acts occurred in Fulton County. The application of reason and common sense compels the conclusion that it was limited to the criminal act charged in the indictment. Moreover, it is likewise clear from the complete charge on the subject that venue in regard to overt acts meant any such act in furtherance of the alleged conspiracy which might have occurred in Fulton County. See *Caldwell v. State*, 142 Ga. App. 831, 832, 833 (2) (237 SE2d 452) (1977).

3. Brown further alleges that the state failed to prove venue in Fulton County beyond a reasonable doubt.

As noted in Division 2, venue in such a case is properly laid either in the jurisdiction in which a conspirator committed an overt act in furtherance of the conspiracy. *Jones v. State*, supra at 899 (7).

The indictment charged appellant with conspiracy with Sam Caldwell, Tom Byrd (her immediate supervisor) and other persons unknown, to commit theft of property belonging to the Georgia Department of Labor. Thirty-eight overt acts in furtherance of the conspiracy were listed.

A number of the alleged overt acts related to appellant's submission of time and attendance reports to the Georgia Department of Labor offices in Fulton County and her subsequent receipt of payroll checks which were authorized to be issued and were issued by the Department of Labor in Fulton County. Other acts alleged Brown's submission of travel vouchers to the department and her consequent reimbursement checks from the department's offices in Fulton

County. Still others alleged her submission of documents to the department in Fulton County, such documents said to contain false information regarding the performance of her duties.

The transcript contains ample evidence that such documents were submitted to the department in Fulton County and that the checks were issued from Fulton County. This was sufficient to have authorized a rational trier of fact to find venue in Fulton County beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

4. Brown maintains that the state failed to prove that Sam Caldwell signed, authorized, or issued the payroll checks as described in the indictment, and therefore that there exists a fatal variance between the allegations of the indictment and the proof at trial.

Assuming that Caldwell's signing, authorizing or issuing of the checks was a material allegation in the indictment, see *Corson v. State*, 144 Ga. App. 559, 561 (2) (241 SE2d 454) (1978), we find no fatal variance. Appellant maintains that there was no evidence that Caldwell ever signed the subject checks or took any action to issue the checks to her. The evidence showed that during the applicable time period, Sam Caldwell was Commissioner of the Department of Labor and as such had the authority to sign checks drawn on the department's bank account. There was further evidence that Caldwell authorized the finance director to use a signature plate bearing Caldwell's name in issuing paychecks drawn on the account.

Brown also contends that there was no evidence that Caldwell was aware that any false or inaccurate reports were being submitted. As just observed, Caldwell authorized, though arguably indirectly, the signing of all department paychecks including those issued to Brown. The paychecks were issued to Brown based upon her representations that she had performed certain labor and service at specific times for the department in her capacity as a field deputy. During many of such periods, Caldwell had cause to know her whereabouts and the services she was performing or not performing for the department. In arriving at a verdict, the jury, from facts proved and sometimes from the absence of counter evidence, may infer the existence of other facts reasonably and logically consequent on those proved. OCGA § 24-4-9. Furthermore, "[o]ne who joins a conspiracy takes it as he finds it and is responsible for acts previously done in carrying out such conspiracy. He also is responsible for actions taken in furtherance of such conspiracy until such conspiracy is ended. . . ." *Crosby v. State*, 232 Ga. 599, 601 (3) (207 SE2d 515) (1974).

5. Appellant asserts that the trial court erred in allowing the state to introduce by testimony the conviction of Robert Armstrong of perjury.

As a defense, appellant tried to show that the state in its investi-

gation and development of the case had engaged in a pattern of prosecutorial misconduct, including the interrogation and harassment of witnesses and subornation of witnesses. Ostensibly to this end, and during the state's case, defense counsel cross-examined an FBI agent about having questioned Bob Armstrong, an employee of the Department of Labor, in the agent's car. To clarify why this was done and to counter the negative impression, the state on redirect asked the agent about the subsequent status of Armstrong, and the agent testified that Armstrong had been tried and convicted of perjury. Appellant's argument is that the conviction of Armstrong should not have been introduced into the trial absent the tendering of Armstrong's indictment and sentence for perjury, i.e., that it was an improper way to impeach or discredit Armstrong and resulted in great prejudice to Brown by informing the jury that a fellow employee had been found guilty of perjury.

It is true that " ' "[a] witness cannot be discredited even by his own testimony that he had been convicted of an offense involving moral turpitude; it is necessary to introduce an authenticated copy of the record of the court in which he was convicted." ' " *Drake v. State*, 245 Ga. 798, 804 (7) (267 SE2d 237) (1980). But this is not the situation here.

Armstrong was not a witness at trial. Nor was the agent's testimony regarding Armstrong's conviction offered for the purpose of impeaching Armstrong's credibility but rather to explain the circumstance and nature and outcome of the interview. This had been explored by defense counsel in cross-examination.

The claim that the best evidence rule was violated has no weight. The state was making no attempt to prove a writing, and the best evidence rule is inapplicable where the contents of a writing are not in issue. OCGA § 24-5-4 (a); *Borenstein v. Blumenfeld*, 151 Ga. App. 420, 421 (2) (260 SE2d 377) (1979).

In addition, we do not accept appellant's speculation that the testimony regarding Armstrong's conviction had any prejudicial impact on Brown inasmuch as Armstrong was another employee of the Rossville office. Although the agent's testimony may have revealed that Armstrong had been a Department of Labor employee, it did not impute any misconduct or wrongdoing to Brown based upon any criminal acts by Armstrong. The connection made by appellant is strained.

6. Appellant next maintains that the state failed to prove beyond a reasonable doubt that she "was not entitled to receive her salary." Here, Brown principally contends that the thrust of the indictment alleged that she committed theft by turning in false time and attendance reports, which reflected that she had been working when in fact she had been on various trips, and by receiving payroll checks based on such reports, and further that the state failed to prove that she

had deprived the State of Georgia of any of her time. She posits that, assuming the state had proved it was deprived of her time, it did not present any evidence that she should have received any sums less than she in fact received or was entitled to. This she claims is due to the fact she had large amounts of unused annual leave at the conclusion of each year. But this part of the argument immediately fails because if Brown was guilty of the conspiracy as charged, then the jury was authorized to find that the reason she had large amounts of unused leave was a direct result of the conspiracy, i.e., falsifying the records of time and attendance by failing to accurately record leave time. Record of used leave, both sick leave and annual leave, was significant because the evidence at trial showed that upon severance of employment with the Department of Labor, she would have been entitled to be paid for forty-five days of unused and accumulated annual leave time, and that any forfeited sick leave and annual leave time in excess of six months would have counted toward service time for the purpose of her retirement. The crime was committed when the agreement to retain the leave credit was made and an act in furtherance of that agreement occurred.

Brown claims also that the state presented no evidence that a salaried employee at her grade level and pay would receive any less money if the records had "reflected that she had gone to the Bahamas rather than Gainesville or to Florida rather than Calhoun." Gainesville and Calhoun, however, were locations at which she could have had legitimate work to do.

She insists further that generally "[i]f a successfully completed conspiracy would not produce the unlawful receipt of any property, no crime would be committed."

"A person commits the offense of conspiracy to defraud the state when he conspires or agrees with another to commit theft of any property which belongs to the state or to any agency thereof or which is under the control or possession of a state officer or employee in his official capacity. The crime shall be complete when the conspiracy or agreement is effected and an overt act in furtherance thereof has been committed, regardless of whether the theft is consummated." OCGA § 16-10-21 (a).

To sustain a conviction the state was not required to prove beyond a reasonable doubt that Brown was not entitled to receive her salary. The gist of the offense is the corrupt agreement and an act in furtherance of it, not the realization of the goal of that agreement. Moreover, we cannot agree with Brown's contention that if a successfully completed conspiracy would not produce the unlawful receipt of any property here, no crime would be committed. Conspiracy has been defined as combination either to accomplish an unlawful end, or to accomplish a lawful end by unlawful means. *Rollins v. State*, 215

Ga. 437, 439 (1) (111 SE2d 63) (1959). Even if appellant through her subject actions ultimately received no more than she would have been entitled to because of unused leave, we cannot accept her apparent conclusion that any conspiracy to commit the theft, or indeed, the theft of property itself, could be undone in retrospect. To accept such a construction of the statute would permit defendants to avoid criminal liability by correcting the records after being caught in falsification. Intent at the time of the act seals it. See, e.g., *Martin v. State*, 143 Ga. App. 875, 876 (1) (240 SE2d 234) (1977). Moreover, this does not answer the evidence of money received as a result of false travel vouchers.

7. Appellant asserts that the trial court erred in denying her plea in abatement "which was based upon the participation of a special assistant attorney general in the grand jury as its legal advisor."

A plea in abatement challenged the returned indictment because of the undisputed fact that it was presented to the grand jury by Special Assistant Attorney General O. Hale Almand, Jr. Appellant contends that Almand acted without authorization or permission of the District Attorney of Fulton County, and that the indictment was fatally defective because the district attorney did not sign it.

Even if it were required that the district attorney approve or permit a representative of the Attorney General to present an indictment to the grand jury, see OCGA § 45-15-10, there is no evidence that such approval was lacking. The burden is on the pleader to show the defect. See, e.g., *Meriwether v. State*, 63 Ga. App. 667, 668 (1) (11 SE2d 816) (1940). Nor is an indictment not signed by the district attorney subject to attack by an accused because it is not so signed. *Ellison v. State*, 82 Ga. App. 760 (1) (62 SE2d 407) (1950).

"The Attorney General . . . shall represent the state . . . in all . . . criminal cases in any court when required by the Governor, and shall perform such other duties as shall be required by law." 1983 Constitution of the State of Ga., Art. V, Sec. III, Par. IV. The Attorney General is authorized "to prosecute in the criminal courts of this state any official, person, firm, or corporation which violates any criminal statute while dealing with or for the state or any official, employee, department, agency, board, bureau, commission, institution, or appointee thereof; . . ." OCGA § 45-15-10. "The Governor shall have the power to direct the Department of Law, through the Attorney General as head thereof, to institute and prosecute in the name of the state such matters, proceedings, and litigations as he shall deem to be in the best interest of the people of the state." OCGA § 45-15-35.

The record contains a copy of a one-page document certified by the Attorney General to be a true and correct copy of a letter maintained in his office, addressed to him from the Governor and directing

him to investigate the Georgia Department of Labor and prosecute any offenses disclosed in such investigation, as stated in the letter. It further contains an administrative order by the Attorney General appointing Almand as Special Assistant Attorney General to assist in the investigation as ordered by the Governor. The Governor had the statutory right to issue such directive, OCGA § 45-15-18, and the Attorney General was authorized to act upon it and make such appointment. OCGA § 45-15-30.

Appellant contends that the Attorney General's right to prosecute does not permit him except under narrow express exceptions to present a proposed indictment before a grand jury. This has been decided adversely to appellant. *Meredith v. State*, 148 Ga. App. 853, 854 (1), 855 (253 SE2d 220) (1979). Furthermore, the aforementioned authorities in the instant case clearly authorized the subject prosecution. Id. at 855 (1).

Lastly, appellant contends there is impermissible danger in the Attorney General's dealing with the grand jury due to conflict between the Attorney General's giving legal advice to officers or employees of the Department of Labor and prosecuting department officers or employees who violate the laws. Such a dual role is authorized. See 1983 Constitution of Ga., Art. V, Sec. III, Par. IV; 1976 Constitution of Ga., Art. VI, Sec. X, Par. II; OCGA §§ 45-15-10, 45-15-34. Moreover, in other circumstances, it has been held proper for the Attorney General to fulfill a constitutionally or statutorily mandated dual role as prosecutor and legal advisor. See *North Fulton Community Hosp. v. State Health Planning &c. Agency*, 168 Ga. App. 801, 805 (3) (310 SE2d 764) (1983).

8. Appellant next contends that the jury should not have been permitted to find her guilty of the crime based on an agreement for theft of services because theft of her services as an employee is not embraced within the meaning of "property" in the law she is charged with violating. The indictment charged both money and services. A special demurrer challenged the inclusion of services but was overruled. Several requests to charge, which would have instructed the jury that conspiracy for theft of services would not be a crime, were rejected. Thus the jury was authorized to convict Brown if it found there was an agreement to defraud the State, or commit theft from the State, of her services, that is, the performance of her duties as a State employee. That was in error, says appellant, because only "tangible property" is intended by the legislature to be included in the statute.[1]

---

[1] Appellant considers money to be tangible property, although the case which she primarily relies on, *Cadle v. State*, 101 Ga. App. 175, 186 (113 SE2d 180) (1960), regards it as intangible property it does not matter here whether money is tangible or intangible property,

As we have noted in Division 6, OCGA § 16-10-21 (a) states: "A person commits the offense of conspiracy to defraud the state when he conspires or agrees with another to commit theft of *any property* which belongs to the state or to any agency thereof *or* which is under the control or possession of a state officer or employee in his official capacity. The crime shall be complete when the conspiracy or agreement is effected and an overt act in furtherance thereof has been committed, regardless of whether the theft is consummated. . . ." (Emphasis supplied.) The statute which provided that such activity was an offense was passed in 1968. Ga. L. 1968, pp. 1249, 1307. By that same act, the definitional section of the criminal code was broadened to include many terms. Ga. L. 1968, pp. 1249, 1263. One of the terms defined was property: "As used in this title, the term . . . 'Property' means anything of value, including but not limited to . . . services, . . ."[2] That act, as relates to both code sections insofar as they are here pertinent, has not been changed since. OCGA §§ 16-10-21 (a); 16-1-3 (13). Thus it is plain that an employee's services can be the subject of a criminal conspiracy to defraud the State of property which belongs to it or is under the control or possession of a state officer or employee. It follows that the State was entitled, on an ongoing basis, to the services which defendant agreed to perform in fulfilling her function and duties when she accepted employment with the State's labor department. Although not necessary to prove the conspiracy, the evidence showed that the State was actually deprived of those services on a number of occasions. Not only did appellant not devote herself to department tasks when she reported that she was working, but what would have been her assignments had to be curtailed. This, too, amounted to loss of services to the State.

Appellant relies on several cases to conclude that "services" are not included in "property" as used in OCGA § 16-10-21 (a), but they do not support her. *Cadle v. State*, 101 Ga. App. 175 (113 SE2d 180) (1960), while it gives a fine history of the predecessor prohibition up to 1960, does not hold or suggest that "services" would not be included in the current law. For one thing, it construed an earlier statute, Code 1933, §§ 26-4201-4202. While that statute also used the term "any property," the term "property" was not defined in the code. The Court, in reviewing the development of the law, concluded that "money" was included because of a controlling Supreme Court of

---

because the issue is whether services are included in "property," not whether intangible property is included. At any rate, appellant concedes that money is included in the term "property" in OCGA § 16-10-21.

[2] The 1933 code did not provide a definition for the term property as used in the criminal code. The 1910 code, Penal Code § 2, had defined it as including real and personal property.

Georgia decision even if "intangible property" had been eliminated. It also concluded that the statute was not aimed at political activity undertaken by officials and employees while they were performing official duties, because such activity was instead governed by rules and regulations promulgated by the Merit System Council pursuant to Ga. L. 1943, pp. 171, 176 (1957 Code Ann. § 40-2207). The legislature did not intend to also make it a crime, the Court reasoned, so that any indirect or consequential loss of their employment services on such occasions was not "property." But it noted that if there was an agreement for an employee to make a State-paid trip solely for political purposes, the loss sustained by the State might be of the services of the employee rather than of the compensation paid to him. That was not the question before it, however. At issue was whether the indictment was sufficiently definite to apprise the defendant of what he was charged with. And because at that time no overt act had to be charged or proved, the criminal agreement itself, simply the offense, the Court held that the indictment must with particularity set forth the nature of the agreement and the exact end to be accomplished thereby, which meant particularizing what property (in that case, money) the State would have been deprived of. Otherwise, said the Court, the defendant would not be on notice of what he was required to meet. Now, of course, an overt act is required, and we do not have a complaint of lack of definiteness of the indictment; what we have is a disagreement as to what "property" is to be included. The statutory definition controls, and the definition we adhere to is not out of harmony with the analysis set out in *Cadle*, supra.

Appellant puts forth *DeFoor v. State*, 233 Ga. 190, 192 (2) (210 SE2d 707) (1974), as limiting the meaning of "property" so as to exclude services. But the statute construed there prohibited the selling of "any personal property." The Court noted the vast difference between reciting "property" and reciting "personal property": "The definition of 'property' given in Code Ann. § 26-401 (n) [now OCGA § 16-1-3 (13)] lists numerous things of value, including real estate, tangible and intangible personal property, contract rights, and services. The General Assembly in enacting the statute we are dealing with here (Code Ann. § 26-2306 (b)) [now OCGA § 16-10-6] obviously did not intend that this broad definition of 'property' should be applied, because it limited the term property by the word 'personal.' " No such limitation is put on the word "property" as used in OCGA § 16-10-21 (a). In fact, no limitation is put on it whatsoever, except as articulated in OCGA § 16-1-3 (13), where it is specifically and affirmatively expressed that it shall include services.

One last attempt at demonstrating a confined meaning is made by reference to *Jessup v. State*, 215 Ga. 771 (113 SE2d 390) (1960). That case, like *Cadle*, construed the pre-1968 statute which was the

predecessor of the current law on conspiracy to defraud the State. The indictment charged the defendant with conspiring to defraud the State out of money. The issue was whether the money in question either belonged to the State or was under the control or possession of a public officer. Thus the focus was on the relationship of the State to the money in question. The Court concluded that, since the State had no title to or possession of the unremitted taxes reported as due, the sum of money in question did not at the time the crime allegedly occurred belong to the State nor was it within the control or possession of its officers. Appellant here does not assert that the services which she agreed to perform when becoming employed and staying on the payroll, did not come within this required relationship with the State. Nor would we question it; her services belonged to the State by virtue of her employment and the evidence is that she not only conspired to but did withhold such services and deprive the State of them.

9. Lastly, appellant contends that the State failed to prove the existence of a conspiracy, namely that neither Sam Caldwell or her supervisor Tom Byrd were shown to be a party to any conspiracy. She submits that the evidence merely showed misdemeanor theft as opposed to conspiracy to defraud the State, a felony. She does not deny there was evidence of an overt act.

"The question of the existence of a conspiracy is ultimately for the jury to determine. [Cit.] The existence of a common design or purpose between two or more persons to commit an unlawful act may be shown by direct or circumstantial evidence." *Hurt v. State*, 239 Ga. 665, 673 (11) (238 SE2d 542) (1977). It may be shown by conduct as well as by direct proof or express agreement, by inference as well as deduction from conduct which shows common design on the part of persons charged to act together for the accomplishment of the unlawful purpose. *Wireman v. State*, 163 Ga. App. 439, 440 (2) (295 SE2d 530) (1982).

"The type of agreement necessary to form a conspiracy is not the 'meeting of the minds' necessary to form a contract and may be a 'mere tacit understanding between two or more people that they will pursue a particular criminal objective.'" *Kilgore v. State*, 251 Ga. 291, 299 (3) (c) (305 SE2d 82) (1983). "[I]t is well settled that when individuals associate themselves in an unlawful enterprise, any act done in pursuance of the conspiracy by one or more of the conspirators is in legal contemplation the act of all." *Evans v. State*, 167 Ga. App. 396, 397 (1) (306 SE2d 691) (1983), disapproved on other grounds, *Teague v. State*, 252 Ga. 534, 536 (1) (314 SE2d 910) (1984).

We view the evidence in a light most favorable to the jury's verdict after it has been rendered, inasmuch as it is the function of the jury, not the appellate court, to determine the credibility of witnesses and weigh any conflicts in the evidence. Any rational trier of fact rea-

sonably could have found proof of the essential elements of the crime charged beyond a reasonable doubt in this case. *Laws v. State*, 153 Ga. App. 166, 167 (1) (264 SE2d 700) (1980); *Jackson v. Virginia*, supra. Sam Caldwell was the department head. He was the one who was taking Brown on pleasure trips when she should have been working as a field deputy. He allowed her to be compensated as though she were working. A review of the evidence when totaled up, is sufficient to show a tacit agreement to permit this. That, plus an overt act, constitutes the crime.

*Judgment affirmed. Deen, P. J., and Pope, J., concur.*

DECIDED DECEMBER 3, 1985 —
REHEARING DENIED DECEMBER 19, 1985 — 

*Christopher A. Townley*, for appellant.

*Michael J. Bowers, Attorney General, O. Hale Almand, Jr., Special Assistant Attorney General, George P. Shingler, Assistant Attorney General*, for appellee.