## A00A0947. CALLAWAY v. THE STATE.
(542 SE2d 596)

RUFFIN, Judge.

Harry Callaway, a chiropractor, was convicted in Spalding County Superior Court of three counts of insurance fraud for participating in a scheme whereby others would stage an automobile collision and Callaway would prepare false bills for chiropractic treatment allegedly provided. On appeal, Callaway contests the sufficiency of the evidence and raises certain other issues. For reasons discussed below, we affirm.

Michael Lawrence testified at trial that he was a "runner" for Dr. Callaway. As Lawrence described it, a runner would recruit people to stage traffic accidents, and then bring them to the chiropractor, who would pay the runner a referral fee. Lawrence testified that Dr. Callaway initially paid him "$250 per head," but that he later "got a raise to $300." Lawrence claimed that he was sometimes paid in advance. In addition to direct payments from Lawrence, the individuals who were treated by Dr. Callaway would receive money through settlement of their tort claims, which were expected to be greater the more often they had allegedly received chiropractic treatment.

Lawrence testified that he had talked with Callaway about the fact that accidents were being staged. According to Lawrence, when he first met Callaway and discussed the staging of wrecks, Callaway "told me he didn't like it." However, after Lawrence and another individual "sat down and talked with [Callaway] about it," Callaway "got more familiar with me and he felt more comfortable with me because I would bring a lot of people in to him. So every time I come in, I didn't necessarily have to say that this wreck was staged. He knew what I was doing."

On October 22, 1992, Lawrence arranged with several others to stage a collision between a Cadillac and a van in Spalding County. Pursuant to the arrangement, Bobby Fish drove his Cadillac through a stop sign and struck John Leaks' van from behind. Three other men — Michael Stewart, Joe Tyson, and Roderick Gordon — were in the van with Leaks at the time of the accident. A woman was in the Cadillac with Fish.

The police arrived on the scene and filled out an accident report. Thereafter, Lawrence and the others drove to the office of Dr. O'Brien, a chiropractor. Leaks and several others (including, apparently, individuals who were not actually in the van at the time of the collision) went in to be treated by Dr. O'Brien. Because he "couldn't take everybody to the same chiropractor," Lawrence then sent Stewart, Tyson, Gordon, and Fish to Dr. Callaway's office in Clayton County, with Fish driving the Cadillac. Lawrence testified that he

"called Mr. Callaway and told him [Fish] was on his way." Lawrence testified that, at the time of the collision,

> a lot of investigation was going on. . . . I sent these four guys down to Dr. Harry Callaway. At that time, the investigation was kind of heavy, and Dr. Harry Callaway advised me to, if I could, send the people and . . . stay away as much as I could. So I sent the people down and . . . he took the people on from there, he treated the people.

After arriving at Callaway's office, Stewart, Tyson, and Gordon went inside for examination and treatment by Callaway. Fish claimed that he waited in the car. Gordon testified that he told Callaway that he was "supposed to be . . . bringing people back and forth," and asked if he was "supposed to get some money." According to Gordon, Callaway said that "Michael has the money — Michael Lawrence, I've already paid Michael."

Stewart, Tyson, and Gordon each visited Dr. Callaway for examination or treatment on subsequent occasions. Lawrence testified that he talked with Callaway in late December, and that Callaway "told me that I needed to get these guys back in so they could sign release forms so that they can get their checks and that he could get his money out of the case." Lawrence said that, because these three had been to Callaway only a few times, Callaway told him they would need to sign "some kind of form . . . to say they came in anyway."

In late December, Stewart, Tyson, and Gordon each signed bills prepared by Callaway's office purporting to show the dates they had been treated, the types of treatment, and the cost. These bills indicated that Stewart and Gordon had visited Callaway's office for treatment 24 times each, and that Tyson had visited Callaway 21 times. Each of the bills was signed by Callaway and the patient, acknowledging that "the above dates and fees are correct" and authorizing payment directly to Callaway. These bills were subsequently sent to Federated Mutual Insurance Company, Leaks' insurer. Gordon's bill was also sent to his insurer, Progressive Insurance Company.

At trial, Stewart, Tyson, and Gordon all testified that they had not actually seen Callaway as often as reflected in the bills. Tyson testified that he had seen Callaway at most on three or four occasions, while Stewart said he saw Callaway ten or eleven times. Gordon did not know exactly how many times he went to see Callaway, but knew that it was less than 24. Stewart said that he discussed the discrepancy with Callaway before signing the bill, and that Callaway "told me the more visits that I had, the more money I'd get at the end of the claim."

Callaway admitted having a relationship with Lawrence, but

denied that Lawrence was a "runner." He testified that Lawrence

> came into our office in about 1989 and he said that he had a lot of people that he knew — they contacted him when they got in wrecks, and that would I be interested in him bringing them to me or whatever. I said, well, I can't pay you for bringing people to me, but . . . if you will actually transport these people and get them to and from me, that I can pay you Eight Dollars per visit. It would be against the law for me to pay you, you know, for a person per se.

Callaway said that he never paid Lawrence any money other than $8 per visit for transporting people to his office. He denied that he billed for any services that were not rendered.

Callaway testified that, during 1992, he would usually see between 40 and 70 patients a day. When a patient came in to see him, a record of the visit would be made on the patient's "o-sheet," a piece of paper marked like a blank calendar. Callaway would not personally fill out the o-sheet, or even look at the patient's file, but would leave that to the person at the front desk. However, Bonnie Wilson, a former employee of Dr. Callaway, testified that she had personally seen Callaway on occasion fill out o-sheets for patients who had not actually been to see him.

1. A person commits the offense of insurance fraud when he

> knowingly or willfully . . . [m]akes or aids in the making of any false or fraudulent statement or representation of any material fact or thing . . . [i]n any written statement or certificate . . . for the purpose of procuring or attempting to procure the payment of any false or fraudulent claim or other benefit by an insurer.[1]

Count 1 of the indictment alleged that Callaway made a false and fraudulent statement for the purpose of procuring payment of an insurance claim from Progressive, relating to treatment allegedly given to Gordon. Counts 2 and 3 alleged that Callaway made false and fraudulent statements for the purpose of procuring payment of an insurance claim from Federated, relating to treatment allegedly given to Stewart and Tyson. Each count alleged that the insurance claim was false and fraudulent in that Callaway (1) "did knowingly and willfully aid and abet Michael Lawrence who did knowingly and willfully encourage, hire, counsel and procure the insureds, Bobby Fish and John Leaks, to stage an automobile wreck"; and (2) "did

---

[1] OCGA § 33-1-9 (a).

knowingly and willfully aid and abet Michael Lawrence who did knowingly and willfully encourage, hire, counsel and procure others, to wit: Roderick G. Gordon, Michael Stewart, and Joe Tyson, to claim that they were injured" in the accident.

(a) Callaway claims that the evidence was insufficient to show his participation in an insurance fraud scheme because there was no evidence that he knew the collision in question was staged. He points to the fact that Lawrence never testified that he told Callaway that this specific collision was staged.[2] Assuming that it was necessary for the State to prove such knowledge,[3] however, there was significant evidence from which the jury could have concluded that Callaway actively participated in the insurance fraud scheme with the understanding that the wreck was staged.[4]

According to Lawrence, Callaway was aware that Lawrence was sending him people from staged wrecks, and was paying him $250-$300 per head for any such referrals. There was clearly evidence that Callaway knew of Lawrence's involvement with the collision in question. Lawrence testified that he called Callaway after the collision and told him that he was sending people over. Callaway told him to "send the people and . . . stay away as much as I could." When Gordon asked Callaway about receiving payment, Callaway told him that "Michael has the money — Michael Lawrence, I've already paid Michael." This statement not only shows that Callaway was aware of Lawrence's involvement, but also shows that he knew Gordon expected to be paid for his participation in the wreck. Given the nature of Callaway's relationship with Lawrence, this provides strong evidence that Callaway understood the collision was staged. Such conclusion is reinforced by Callaway's actions in preparing false bills, urging Lawrence's assistance in getting his accomplices to sign these false bills, and inducing Stewart to sign a false bill by telling him he would get more money in his tort claim. Considered in the light most favorable to support the verdict, the evidence was thus

---

[2] Although the enumeration contends that the evidence was insufficient only as to Count 1, the argument section of Callaway's brief addresses all three counts.

[3] Clearly, preparing a bill for treatment not actually provided, knowing that the bill would be used to procure payment from an insurer, would constitute insurance fraud even if the underlying collision was not staged, or the provider was unaware that it had been staged. As Callaway points out, however, the indictment in this case alleged that the fraud consisted of his aiding and abetting Lawrence with respect to the staged wreck, as opposed to simply preparing fraudulent bills. Because this allegation described the manner in which the offense was committed, the State was required to prove it at trial. See *McBride v. State*, 202 Ga. App. 556, 557 (415 SE2d 13) (1992).

[4] It was not necessary to show that Callaway knew of the staged wreck before it occurred. "[O]ne who joins a conspiracy takes it as he finds it and is responsible for acts previously done in carrying out such conspiracy." (Punctuation omitted.) *Brown v. State*, 177 Ga. App. 284, 288 (4) (339 SE2d 332) (1985).

sufficient to enable the jury to conclude that Callaway was an active and knowing participant in the insurance fraud scheme.

(b) Callaway contends that the evidence was insufficient because there was no evidence that he actually received any money from an insurance company. He notes that the indictment alleged that he "did knowingly and willfully procure and attempt to procure payment." Because the indictment alleged that he *procured* payment, he contends that the State was required to prove such procurement in order to obtain a conviction.

This contention is without merit. The actual procurement of payment from an insurer is not an element of the crime of insurance fraud. Rather, the State must prove that the defendant made a false statement "for the purpose" of procuring or attempting to procure payment of a false or fraudulent claim.[5] Once a defendant makes a false statement for such purpose, the crime is complete, and it is irrelevant whether or not the claim is subsequently paid.

We have previously held that

> [m]ere surplusage will not vitiate an indictment, and need not be established in proof. The material facts which constitute the offense charged must be stated, and [they] must be proved in evidence. But allegations not essential to such purpose, which might be entirely omitted without affecting the charge and without detriment to the indictment, are considered as mere surplusage, and may be disregarded in evidence.[6]

To put it differently, "[w]hile all material averments — i.e., averments that describe either the offense or the manner in which it was committed — must be proved as alleged, an unnecessary description of an unnecessary fact need not be proved."[7] Because actual receipt of payment is not an element of insurance fraud, any allegation of such receipt is unnecessary, not descriptive of the offense or the manner in which it was committed, and mere surplusage. Accordingly, the State was not required to prove actual receipt of payment in order to obtain a conviction.

(c) Callaway claims that the evidence was insufficient as to Counts 2 and 3 because "Federated Mutual Insurance Company was not an insurer for Michael Stewart or Joe Tyson as alleged in the Counts."[8] He notes that Ginger Murrah, Federated's claims supervi-

---

[5] See OCGA § 33-1-9 (a).

[6] (Punctuation omitted.) *Robinson v. State*, 76 Ga. App. 313, 314 (45 SE2d 717) (1947).

[7] (Citation omitted.) *McBride*, supra.

[8] The indictment does not, in fact, allege that Federated is the insurer for Stewart or

sor, testified that Federated refused to pay the claims because it believed Stewart and Tyson "were in the other vehicle and not in our policyholder's vehicle" at the time of the collision. Whether Federated was contractually obligated to pay the medical bills, however, is irrelevant to a prosecution for insurance fraud. The crime is committed when one makes a false statement in writing "for the purpose of procuring or attempting to procure" payment of a fraudulent claim from an insurer.[9] The evidence clearly authorized the jury to conclude that the false bills were created "for the purpose of" procuring payment. It makes no difference that such attempt was unsuccessful.

2. Callaway argues that venue with respect to Counts 2 and 3 was not proper in Spalding County, where the staged wreck occurred.[10] This contention is without merit. Under OCGA § 33-1-9 (b), the crime of insurance fraud is considered to have been committed "in any county where any act in furtherance of the criminal scheme was committed." As discussed above, the evidence was sufficient for the jury to conclude that Callaway was a participant in the criminal scheme. Because the staged wreck was clearly an act in furtherance of such scheme, venue was proper in Spalding County.

3. Callaway contends that the trial court erred in failing to give a special instruction on venue.[11] He relies on *Osborn v. State*,[12] where we held that

> [a]s a general rule, where there is sufficient evidence of venue and the trial court charges the jury generally on the law of reasonable doubt, it is not necessary for the court to charge the jury that proof of venue is a material allegation of the indictment. However, where the case against the defendant is based upon his activities as a party or conspirator to the crime charged in the indictment and these activities took place in a county other than the one in which the prosecution is brought, a special instruction on venue is necessary to clarify the nature of the criminal activity for which he is on trial.[13]

Because Callaway was charged with participation in a criminal con-

---

Tyson, but simply alleges that it is "an insurer."

[9] OCGA § 33-1-9 (a).

[10] For some reason he does not assert that venue was improper as to Count 1.

[11] The only arguable reference to venue in the court's charge was where it instructed the jury that it would be authorized to convict Callaway if it found beyond a reasonable doubt that he "did commit in Spalding County, Georgia, the crimes as charged in the bill of indictment."

[12] 161 Ga. App. 132 (291 SE2d 22) (1982).

[13] (Citations omitted.) Id. at 136 (3).

spiracy, and because the acts allegedly committed by him took place in Clayton County, he contends that a special charge on venue was required by *Osborn*. He does not state what that charge should have consisted of, nor does he contend that he was harmed by the failure to give such charge.[14] For the reasons discussed below, we conclude that any error in failing to give a special charge on venue was harmless.

The defendant in *Osborn* was prosecuted in Gwinnett County for selling marijuana. The evidence showed that the defendant "fronted" marijuana to a dealer, with the expectation that he would be paid from the proceeds of a subsequent sale. This dealer sold some of the marijuana to an undercover officer in Gwinnett County. The dealer informed the police that he was supposed to meet the defendant that evening in DeKalb County. The police then arranged a sting operation, and arrested the defendant in DeKalb County after he gave the dealer two more bags of marijuana. In reversing the defendant's conviction for failure to give a special instruction on venue, we noted that the trial court "did not make it clear that the appellant was on trial for a sale of marijuana in Gwinnett as opposed to DeKalb County. . . . In view of the nature of the evidence against him, this omission must necessarily be considered reversible error."[15]

*Osborn* relied upon our earlier decision in *Jones v. State*,[16] where we recognized that a special instruction on venue may be required in certain cases. The defendants in *Jones* were prosecuted in Bulloch County for conspiracy to possess and sell marijuana, although the actual sale was made in Candler County. The existence of venue in Bulloch County rested solely on the alleged acts of two of the defendants' purported co-conspirators. We reversed the defendants' convictions due to the trial court's failure to instruct on venue, noting that

> under the court's charge, it was possible for the jurors to have found appellants guilty on the basis of the overt acts committed in Candler County, while concluding that the State failed to meet its burden of proof with respect to the overt acts alleged to have taken place in Bulloch County.[17]

Even assuming that the trial court was required to give a special instruction on venue in this case, nothing in *Osborn* or *Jones* suggests that failure to do so is always reversible error, or that it is inap-

---

[14] Indeed, his argument consists simply of quoting the above language from *Osborn* and noting that the trial court gave no charge on venue other than that mentioned above.

[15] Id. at 136 (3).

[16] 135 Ga. App. 893, 900 (7) (219 SE2d 585) (1975).

[17] Id. at 900-901 (7).

propriate to apply a harmless error analysis.[18] The failure to provide venue instructions in *Osborn* and *Jones* was clearly harmful, because in each case the jury could have convicted the defendants of the crimes charged without finding that any act in furtherance of the conspiracy was committed in the county where the defendants were charged. The same does not apply in this case. As discussed above, the crime of insurance fraud is considered to have been committed in "any county where any act in furtherance of the criminal scheme was committed."[19] The indictment alleged that Callaway participated in the criminal scheme by aiding and abetting Lawrence in connection with the staged wreck, which indisputably occurred in Spalding County, and in the making of injury claims arising from the wreck. In order to convict Callaway, therefore, the jury was required to find that he was a participant in a criminal scheme of which the staged wreck was a central part. Thus, in contrast to *Osborn* and *Jones*, the jury could not have convicted Callaway under the indictment without also finding that the crime was committed, and venue therefore proper, in Spalding County. Accordingly, any error in failing to give a special venue instruction was harmless.[20]

4. Callaway argues that his conviction on Count 1 cannot stand because it was based on the uncorroborated testimony of Lawrence, an alleged co-conspirator.[21] He claims that, without Lawrence's testimony, there would be no evidence connecting him to the insurance fraud scheme. We disagree.

Although a felony conviction may not be based on the uncorroborated testimony of an accomplice, the corroborating evidence itself need not be sufficient to warrant a conviction.[22] "[S]light evidence, which may be circumstantial, connecting the accused with the crime is sufficient corroboration."[23] In this case, Callaway's participation in the insurance fraud scheme was corroborated by a number of items of

---

[18] Although it does not appear that the defendants in *Osborn* and *Jones* requested a special charge on venue, neither case discusses this issue. We note that, generally, "[i]t is not reversible error for the trial court to fail to give a request to charge that is not submitted in writing by the complaining party." *Holt v. State*, 244 Ga. App. 341, 344 (3) (535 SE2d 514) (2000). Such failure constitutes reversible error only where "the omission is clearly harmful and erroneous as a matter of law in that it fails to provide the jury with the proper guidelines for determining guilt or innocence." (Punctuation omitted.) Id., quoting *Kitchen v. State*, 263 Ga. 629, 630 (1) (436 SE2d 645) (1993). Because we conclude that any failure to provide a special instruction on venue was harmless in this case, we need not consider whether Callaway's failure to request such an instruction affects our analysis.

[19] OCGA § 33-1-9 (b).

[20] See *Livery v. State*, 233 Ga. App. 882, 886 (3) (506 SE2d 165) (1998) (applying harmless error analysis to failure to give charge on circumstantial evidence).

[21] Although this argument would apparently also apply to Counts 2 and 3, the enumeration addresses Count 1 only.

[22] See OCGA § 24-4-8; *Reaves v. State*, 242 Ga. 542, 543 (1) (250 SE2d 376) (1978).

[23] *Reeves v. State*, 244 Ga. App. 15, 18 (1) (c) (534 SE2d 179) (2000).

evidence, including his statement to Gordon that he had already paid Lawrence, his falsification of medical bills, and his attempt to get Stewart to sign a false bill by telling him that the more visits he had, the more money he would receive in his tort claim.

5. During Lawrence's direct examination, the prosecutor asked him to describe his discussions with Callaway regarding the fact that collisions were being staged. Lawrence responded, "Well, when I first started working for him, I was introduced to him by a guy named Tommy Ellis, who also staged accidents with him. He was already dealing with him at that time." Outside the presence of the jury, defense counsel then moved for a mistrial on the grounds that Lawrence's response improperly placed Callaway's character into evidence. The trial court denied the motion, but agreed to instruct the witness "not to reengage in that same testimony." Defense counsel declined the court's offer to give a curative instruction to the jury, such as an instruction to disregard Lawrence's response. Lawrence gave no further testimony regarding Ellis or any prior staging of accidents by Callaway. On appeal, Callaway asserts that the trial court erred in denying his motion for a mistrial.

Where a defendant moves for a mistrial after a prosecution witness voluntarily injects improper and prejudicial matters, it is within the trial court's discretion to determine whether a mistrial must be granted or whether the effect can be corrected by curative instructions to the jury.[24] "That discretion will not be interfered with on appeal unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial."[25]

Assuming that Lawrence's response did, in fact, improperly place Callaway's character into evidence,[26] Callaway makes absolutely no argument as to how a mistrial was necessary to preserve his right to a fair trial, and does not even assert that curative instructions would have been insufficient to address any harm. Instead, he simply states that a mistrial was required because Lawrence's response "indisputably placed Harry Callaway's character into evidence." In the absence of any argument on this point, and given the fleeting nature of Lawrence's reference to prior incidents — in the context of a two-day trial involving numerous witnesses and voluminous evidence against Callaway — we cannot say that the

---

[24] *Crawford v. State*, 256 Ga. 585, 587 (2) (351 SE2d 199) (1987).

[25] (Punctuation omitted.) *Smith v. State*, 244 Ga. App. 165, 168 (3) (534 SE2d 903) (2000).

[26] We question whether evidence that Callaway had previously participated in similar staged accidents would in fact be inadmissible character evidence, particularly if such evidence related to Lawrence's relationship with Callaway. For some reason, however, the State makes no attempt to argue that such evidence was admissible, and essentially concedes that it was improper.

trial court abused its discretion in concluding that a mistrial was unnecessary and that curative instructions would have sufficed to remove any prejudicial impact the objectionable testimony might have had. Accordingly, the trial court did not err in denying the motion for mistrial.[27]

6. Callaway contends that his trial counsel, Lee Sexton, was ineffective for failing to present evidence that he claims would have supported his case. Callaway presented testimony from several witnesses at the motion for new trial hearing, and cross-examined Sexton regarding his representation. Following the hearing, the trial court entered an order denying the motion for new trial as to each ground.

In order to establish a claim of ineffective assistance of counsel, a defendant must satisfy two burdens. First, he must show that counsel's performance was deficient; second, he must show that he was prejudiced by the deficient performance.[28] With respect to the first prong, the defendant must overcome the "strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance, and that any challenged action by trial counsel might be considered sound trial strategy."[29] With respect to the second prong, the defendant must show a reasonable probability that, but for his counsel's errors, the result of the trial would have been different.[30] "A trial court's finding that a defendant has been afforded effective assistance of counsel must be upheld unless clearly erroneous."[31]

(a) At the motion for new trial hearing, Callaway presented testimony regarding an incident that allegedly occurred in his office more than a year before the staged collision. Helen Shelton, a patient of Callaway, testified that she saw Lawrence and three others come into Callaway's office sometime in 1991. She saw Lawrence write seven names down on the registration pad. According to Shelton, the employee at the front desk, Wayne Gant, told Lawrence to leave. Callaway then came out, counted the number of names Lawrence had written on the register, and told him to leave. Gant also testified about the incident, stating that he asked Lawrence why he had listed seven names when he had brought only three patients. According to Gant, Lawrence said the others would come later that afternoon. Gant said that he told Lawrence to leave because "he had done that

---

[27] See *Smith*, supra. Of course, because Callaway declined the court's offer to give curative instructions, he cannot now complain that the court failed to do so. *Jones v. State*, 250 Ga. 166, 168 (3) (296 SE2d 598) (1982).

[28] *Lowe v. State*, 264 Ga. 757, 758 (3) (452 SE2d 90) (1994).

[29] (Punctuation omitted.) *White v. State*, 216 Ga. App. 583 (1) (455 SE2d 117) (1995).

[30] Id.

[31] (Punctuation omitted.) Id. at 583-584 (1).

before. . . . I'd caught him numerous times."

James East testified that he worked for Callaway from July 1991 until November 1993, and that he never saw Lawrence in the office. He said that the incident described by Shelton and Gant occurred before July 1991. Callaway also testified at the motion for new trial hearing, and claimed that he never saw Lawrence after the 1991 incident until early 1995, when Lawrence came into his office with two other individuals, said that he had been arrested for insurance fraud, and asked for money.

Callaway contends that Sexton was ineffective for failing to investigate the 1991 incident and present testimony from Shelton and Gant regarding it. He argues that this incident would have shown that Lawrence had a motive to falsify his testimony. It is true that "[c]ounsel has a duty to make reasonable investigations."[32] However, the record does not show that counsel's failure to discover that Shelton and Gant might have relevant testimony was the result of an unreasonable investigation. Although Callaway now contends that his alleged 1991 encounter with Lawrence was fraught with significance, and was indeed the last time he saw Lawrence before 1995, there is no indication that he ever mentioned this to Sexton before trial. By his own admission, Callaway saw between 40 and 70 patients per day, and there is no evidence that he ever let Sexton know that any of them may have witnessed an encounter between himself and Lawrence a year and a half before the staged accident — or that such an encounter had even occurred. When Callaway was questioned at trial about his relationship with Lawrence, he completely failed to mention that he had thrown Lawrence out of his office in 1991 for falsely signing patients' names, that he had not seen Lawrence for several years after this incident, and that Lawrence had suddenly shown up in early 1995 demanding money. Instead, he simply said that he paid Lawrence $8 per patient whom Lawrence brought to the office, without any suggestion of a rift between them. A client cannot simply withhold relevant information within his knowledge, of which his attorney would have no reason to be aware, and then claim that the attorney was ineffective for failing to discover such information on his own.

Moreover, with respect to Gant, at least, Sexton clearly had strategic reasons for refusing to call him as a witness. Gant was subpoenaed to testify as a witness for the State, and had apparently made statements to investigators and signed an affidavit incriminating Callaway. Gant testified that, on the day of trial, he spoke briefly

[32] (Punctuation omitted.) *Williams v. State*, 211 Ga. App. 393, 395 (2) (439 SE2d 11) (1993).

with Sexton "[a]bout me testifying . . . in relation to what went on in the office." He did not testify, however, that he told Sexton about the alleged 1991 incident. Sexton testified that "if the State actually called [Gant], I knew what he was going to testify to on my cross examination, that he really didn't say all these things, he really, apparently, didn't make these allegations." Sexton said that Gant signed an affidavit stating that he had been threatened by the Georgia Bureau of Investigation, which Sexton showed to the prosecutor to discourage him from calling Gant. The State did not, in fact, call Gant as a witness. Had Sexton then called Gant as his own witness, Gant would have been subject to potentially harmful cross-examination by the State regarding his prior statements, and Sexton testified that Gant "would have been harmful to Dr. Callaway." Thus, the decision not to call him was clearly a strategic decision.[33]

(b) Callaway also contends that Sexton was inefficient for failing to present testimony from East, who testified at the motion for new trial hearing that he dealt with "99 percent" of Callaway's patients and filled out the o-sheets showing the treatment received. He said that he never saw any records reflecting treatment that had not been provided. East testified that he met with Sexton and the prosecutor on the day of trial. Although Sexton could not recall East's name, he recalled meeting with him, and said that he did not present his testimony because

> I just didn't feel that was relevant, the fact that he didn't see it. The whole point was, the State was alleging that he was doing it in a conspiracy with another lawyer . . . [and] with these other gentlemen, too. I wouldn't expect Dr. Callaway to let his employees see it, nor would — that would've been nonsense to a jury that I call a witness that said he didn't see Dr. Callaway alter records.

"The decision as to which defense witnesses will be called is a matter of trial strategy and tactics, and tactical errors do not constitute ineffective assistance of counsel."[34] Although counsel's decision not to call East may be subject to question, we cannot say that the trial court's determination that counsel was not ineffective in this instance was clearly erroneous.

(c) Finally, Callaway contends that Sexton was ineffective for

[33] See *Ward v. State*, 242 Ga. App. 246, 248 (2) (529 SE2d 378) (2000) (decisions not to call certain witnesses are tactical or strategic in nature and do not equate with ineffectiveness of counsel).

[34] (Punctuation omitted.) *McCant v. State*, 234 Ga. App. 433, 436 (3) (506 SE2d 917) (1998).

failing to present evidence regarding the extent of coverage under Progressive's insurance policy. Because Callaway did not raise this issue in his motion for new trial, however, he has waived the right to raise it on appeal.[35]

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 21, 2000 —
RECONSIDERATION DENIED DECEMBER 14, 2000 — 

*August F. Siemon III,* for appellant.

*William T. McBroom III, District Attorney, Daniel A. Hiatt, Assistant District Attorney,* for appellee.

---

[35] See *McGhee v. State*, 237 Ga. App. 541, 545 (1) (515 SE2d 656) (1999) (" 'any allegation not raised at trial is deemed waived' ").