## A11A0090. WATSON v. THE STATE.
(708 SE2d 703)

ELLINGTON, Chief Judge.

A Walton County jury found Derrick Watson guilty of four counts of armed robbery, OCGA § 16-8-41 (a); aggravated battery, OCGA § 16-5-24 (a); five counts of aggravated assault, OCGA § 16-5-21 (a); burglary, OCGA § 16-7-1 (a); possession of a firearm during the commission of a felony, OCGA § 16-11-106 (b); and conspiracy to possess cocaine, OCGA §§ 16-4-8, 16-13-30 (a). Watson appeals from the denial of his motion for new trial, contending that the evidence was insufficient, that his trial counsel was ineffective, and that the trial court erred in giving certain jury instructions. Finding no error, we affirm.

On appeal, this Court views the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence. *Short v. State*, 234 Ga. App. 633, 634 (1) (507 SE2d 514) (1998). We do not weigh the evidence or determine witness credibility, but only determine if the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). Id.

So viewed, the record shows the following. Late in the evening of September 25, 2006, Michael White, Jamie Jackson, Brian Davis, Mikel Burnett, Untredale Jarrells, and Watson met at White's home in Athens and planned to travel together to Monroe to buy cocaine from a drug dealer, Boris Oliver, with whom they had a passing acquaintance. At some point during the evening, the group decided that they would rob Oliver of his money and cocaine. Watson was present during that conversation, and Davis testified that Watson knew the final plan was to rob the drug dealer. The group left Athens in two cars, White's black Nissan Sentra and Watson's green Ford Explorer.

Upon arriving in Monroe, the six men met with Rod Kelly, who was driving a white Crown Victoria. Kelly, who lived in the area, led the men to Oliver's house and then left. At that point, Watson was driving the Ford Explorer. The men parked the cars near Oliver's house, and then four of them walked up to the house while two stayed near the cars. Davis, who was armed with a knife, kicked the front door open and entered the house with Jarrells, who was armed

with a handgun. The men wore dark clothes and ski masks. After Jarrells and Davis entered, two of their masked co-defendants followed them inside.

As Boris Oliver and Felicia Moon were in their bedroom preparing to go to sleep, they heard a loud noise at their front door. Oliver ran to the front door, which was open, and confronted two masked men, one of whom pointed a pistol at him and said: "You know what it is." The men struggled with Oliver and beat him about the head and face. Moon stepped out in the hall to see what was happening, witnessed the fight, and ran back to her bedroom. She grabbed a gun, climbed into bed with her baby, and called 911. After Jarrells had subdued Oliver, he forced him to the bedroom at gunpoint, demanding money and a "black box." Moon witnessed the masked man struggling with Oliver in the bedroom closet, and Jarrells testified that he took a bag containing $38,000 and drugs out of the closet. Jarrells then demanded money from Moon, who surrendered $1,500 she had hidden under her pillow. Jarrells also took her cell phone. During the ordeal, Moon heard her sister, Jessica, who was living with them at the time, scream. And then she heard a gunshot.

Jessica Moon testified that she and her children were living with her sister and Oliver on the night of the robbery. Sometime after midnight, as she lay in bed, she heard a loud noise at the front door. She got up and saw Oliver struggling with two masked men armed with weapons. One of the men forced his way into her bedroom, demanded money, stole a home phone from her room, and then shot her in the leg. Jessica Moon testified that the bullet, which had not been removed from her leg, continues to cause her pain. After being shot, she heard a man calling to the robbers inside the house, telling them to run. Jessica Moon tried to climb out of the bedroom window, but a man who was standing outside ordered her to get her "butt back in the window."

As the robbery was occurring inside the house, two of Oliver's friends drove into his driveway in a van and parked by the garage. Shawn Giles testified that Oliver had called him earlier that night and asked him to deliver one of his workers, Joey Flint, to his house so that they could load up Oliver's truck for a brick laying job the next day. Giles noticed the Nissan and Ford Explorer parked on the street a short distance away. As Giles and Flint got out of the van, two armed men accosted them and forced them to the ground. One of the men took Giles' wallet. Giles testified that the men were communicating with each other with cell phones or walkie talkies.

The men inside the house continued to demand money from Oliver. Oliver led the robbers to believe that he had hidden money in the garage in the hope of drawing the robbers away from the women and children inside the house. The robbers forced Oliver to the

garage and, while they were in the garage, the 911 operator called the home to follow-up on Felicia Moon's report of a home invasion. Oliver heard one of the robbers announce that the police had been called, and the robbers fled. Felicia Moon gave Oliver her handgun, and Oliver decided to chase the robbers. As he went outside, Oliver met Flint and Giles by the garage. Flint got in Oliver's truck and the two began pursuing the robbers.

As Oliver drove out of his subdivision, he saw a black Nissan Sentra pass him and, shortly thereafter, he saw several men struggling to get inside a moving Ford Explorer. Watson was driving the Ford Explorer, according to one of his co-defendants. The two vehicles sped away from Oliver in the same direction. As the men in the Ford Explorer drove off, Oliver witnessed them taking their ski masks off. As Oliver gave chase, someone in the Ford Explorer fired a gun at him. Moments later, several police cars drove by them, headed toward Oliver's home. One of the police cars turned around and pursued them; the others continued on to Oliver's home. Oliver followed the Ford Explorer until the driver lost control and went off the road into a bank of kudzu. The occupants of the vehicle fled in different directions. When the police arrived, Oliver pointed out the directions in which the robbers had fled.

A police officer testified that, shortly after midnight on September 26, 2006, he and other patrolling, uniformed officers received a dispatch that a woman had been shot and that a burglary was in progress. As the officer drove toward the victim's address, he saw a dark green SUV speeding toward him in excess of 80 miles per hour. One of his fellow officers pursued the SUV while he continued driving to the scene of the shooting. The officer testified that he observed muddy footprints on Oliver's open front door. He secured the house and attended to the injured victim, her sister, and the seven children who were in the house. A search of the home revealed a box in the bedroom closet. Oliver's blood was on the box and on the closet floor.

An officer who searched the wrecked Ford Explorer testified that he found a black ski mask, a camouflage jacket, and a box of .357 caliber ammunition inside the vehicle. In the street near the Explorer, the police recovered cell phones, one of which belonged to Felicia Moon, and a handgun. Though the Ford Explorer was registered in the name of Sheila Stanley, Watson's mother, Stanley testified that Watson used the car almost exclusively and kept it in his possession. Stanley testified that, after she learned the car had been involved in a crime, she called Watson. He told her to report the car stolen, but she refused since the car had not been stolen from her. A search of the car revealed documents such as receipts, insurance papers, and prescriptions in Watson's name.

With the assistance of tracking dogs, the police caught Davis hiding beneath the porch of a residence and Burnett in the backyard of another home not far from where the Ford Explorer had been abandoned. Beneath the porch where Davis had been hiding, the police found a bag of suspected crack cocaine. A short distance from where Davis was found, the police discovered Oliver's home phone and Giles' wallet. The police later located the black Nissan Sentra, which belonged to White, at White's house in Athens. The police found White and Jackson there and arrested them. Jarrells, Davis, and Burnett pleaded guilty to armed robbery and later testified at Watson's trial.

1. Watson contends the State's evidence was insufficient to convict him of the crimes charged as a conspirator because the testimony of his co-defendants shows, at most, that he was merely present during the commission of the crimes, that he had no intent to buy drugs or to steal drugs and money from Oliver, and that, even if the testimony of his accomplices is sufficient to establish his presence and knowing participation in the crimes, their testimony was not sufficiently corroborated.

> In felony cases, . . . the uncorroborated testimony of an accomplice is insufficient to authorize conviction. Nevertheless, slight evidence of corroboration connecting the defendant with the crime will suffice, and such evidence may be circumstantial. The sufficiency of the corroboration of an accomplice's testimony is peculiarly a matter for the jury to determine.

(Punctuation and footnotes omitted.) *Smith v. State*, 281 Ga. App. 587, 588 (1) (636 SE2d 748) (2006); see also OCGA § 24-4-8. Moreover, "where an additional accomplice provides testimony to corroborate that of the first accomplice, the evidence can suffice to sustain the conviction." (Citations omitted.) *Gallimore v. State*, 264 Ga. App. 629, 630 (591 SE2d 485) (2003).

Both Davis and Burnett testified that Watson was present from the robbery's inception through its execution. While neither Davis nor Burnett stated that Watson had a weapon or went inside Oliver's house or the garage, the jury could infer from the testimony of both men that Watson was aware of the conspiracy to obtain Oliver's money and cocaine by armed robbery and that he willingly participated in the crimes and shared the criminal intent of those who committed crimes inside the residence by supplying his car and services to them as a get-away driver. See *Bruce v. State*, 263 Ga. 273, 274-275 (5) (430 SE2d 745) (1993) (discussing the circumstances under which the intent and acts of the acting conspirators may be

imputed to other conspirators, even though other conspirators did not directly commit the acts charged). Further, the testimony of Watson's accomplices, Burnett and Davis, corroborate each other.

Also, the police found proceeds from the crime in the Ford Explorer as well as tools used in the crime, including bullets and a ski mask. Watson possessed and used the Ford Explorer, as evidenced by documents found inside the car and the testimony of Watson's mother. Watson's mother testified that, shortly after the robbery, Watson asked her to report the car stolen, even though the car was in his possession — a fact from which the jury could infer a guilty conscience and an effort to conceal his participation in the robbery. These facts were sufficient to corroborate the testimony of Watson's accomplices. See *King v. State*, 268 Ga. App. 811, 813 (1) (603 SE2d 88) (2004). Therefore, Watson's contention that the evidence was insufficient to establish his participation under a conspiracy theory must fail.

2. Watson contends the evidence was insufficient to convict him of the armed robbery of Boris Oliver because the evidence failed to show that anything of value was taken from Oliver's person or immediate presence by use of a deadly weapon.

OCGA § 16-8-41 (a) provides: "A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]" Watson contends that, because Oliver denied that cash or cocaine was taken from him and because the evidence concerning where he was when the theft occurred was conflicting, the cash and cocaine was not taken from his "immediate presence." We disagree.

In this case, Oliver testified that one of Watson's accomplices forced him at gunpoint through his home and in to the back bedroom closet, during which time the robber demanded money and the contents of a box. Felicia Moon witnessed Oliver and the robber struggling in the closet, and Oliver's blood was found on the closet floor and on the box in the closet. Jarrells testified that he took a bag of cash and cocaine from Oliver's closet. Further, according to both Felicia Moon and Oliver, Jarrells also took the $1,500 in cash hidden under Moon's pillow at gunpoint while both she and Oliver were together in the bedroom. Given this evidence, a jury could find beyond a reasonable doubt that property was taken by use of an offensive weapon from the immediate presence of Oliver and, therefore, that the evidence was sufficient to support Watson's conviction for the armed robbery of Oliver beyond a reasonable doubt. See *Harp v. State*, 302 Ga. App. 17, 17-18 (690 SE2d 424) (2010).

3. Watson contends that the trial court's decision to recharge the jury on the concepts of conspiracy theory and accomplice liability

following a question from the jury was confusing and misleading and, therefore, constituted reversible error. Watson does not contend that the recharge misstated the law, but that by refusing to answer the jury's questions with a recharge instead of a simple "no," the court deprived him of his defense that he was merely present and not an active participant in the crimes. Further, Watson also contends that his trial counsel was ineffective for failing to object to the trial court's recharge.

(a) During deliberations, the jury sent a note containing the following questions to the judge: "If guilty of conspiracy to possess cocaine (or any other charge), are they guilty of all charges? If one is guilty of a crime, then are they all guilty of the same crime?" After discussing the questions with the attorneys, the court told the jury that "conspiracy is a legal theory that can apply to any crime. It's not just to conspiracy to possess cocaine, if you so find." The court then recharged the jury on the law concerning conspiracy theory and accomplice liability. The court explained that "conviction of one defendant does not necessarily require conviction of another," that, even if the jury found a conspiracy, it still had to find that "the State has proven that each defendant was or was not in the conspiracy," and that, while the law may "authorize" a conviction under a conspiracy theory of liability, it never "mandate[s]" it. The court reminded the jury to consider its previous jury charge. The court asked the jury if the recharge answered the questions posed and several jurors nodded their heads. When the court asked if the jury had any other questions, a juror asked a question about crimes of moral turpitude, but no one asked anything further regarding conspiracy.

"As a general rule, the need, breadth, and formation of additional jury instructions are left to the sound discretion of the trial court." (Citation and punctuation omitted.) *Cloyd v. State*, 237 Ga. App. 608, 610 (3) (516 SE2d 103) (1999). "It is not error to recharge only on the specific question so long as the recharge taken alone does not leave an erroneous impression in the minds of the jury." (Citation and punctuation omitted.) Id. "To determine whether a recharge is erroneous, we examine the charge as a whole, including both the initial charge and the recharge." (Citation omitted.) Id.

Here, the judge instructed the jury to consider the entire charge that had been given to it earlier, a charge that thoroughly covered the concepts of knowledge, intent, and mere presence. The judge explained that he was rereading the conspiracy charge because he believed the jury's question pertained only to that charge. After rereading the conspiracy instruction, the judge asked if the recharge had answered the jury's question, and by all indications it had. We conclude that the recharge was proper and that it did not overem-

phasize the State's theory of the case, that it did not contain a comment on the evidence, and that it did not leave an erroneous impression in the minds of the jurors. See id. Moreover, we agree with the State's assertion that simply answering "no" to the questions posed would have been a grossly over-simplified and misleading response to the jury's questions. This is true because the answer to the question necessarily depends upon whether a conspiracy exists, whether Watson was a member of the conspiracy, and whether his actions were naturally or necessarily done in furtherance of the conspiracy. In short, there is no simple "yes" or "no" answer to the questions posed.

(b) By recharging the jury on the concepts of conspiracy theory and accomplice liability as it did, the court correctly and fairly answered the question posed. It follows, therefore, that "counsel's failure to make a meritless objection to the recharge does not constitute deficient performance." (Citation omitted.) *Mikell v. State*, 286 Ga. 722, 724 (2) (b) (690 SE2d 858) (2010). Because Watson failed to show that counsel's performance was deficient, his claim of ineffective assistance of counsel must fail. See id.

4. Watson contends the court erred in failing to give, sua sponte, both a general venue charge and a special venue charge pertaining to acts that occurred outside the county in which the case was tried.

> As a general rule, where there is sufficient evidence of venue and the trial court charges the jury generally on the law of reasonable doubt, it is not necessary for the court to charge the jury that proof of venue is a material allegation of the indictment. However, where the case against the defendant is based upon his activities as a party or conspirator to the crime charged in the indictment *and these activities took place in a county other than the one in which the prosecution is brought*, a special instruction on venue is necessary to clarify the nature of the criminal activity for which he is on trial.

(Citations omitted; emphasis supplied.) *Osborn v. State*, 161 Ga. App. 132, 136 (3) (291 SE2d 22) (1982).

The record in this case shows sufficient evidence of venue, and the trial court charged the jury generally on the law of reasonable doubt. Therefore, it was not necessary for the trial court to charge the jury generally that proof of venue is a material allegation of the indictment. Id. Also, the indictment alleged that Watson participated in the criminal scheme with his co-defendants to commit crimes that occurred in Walton County. All of the crimes alleged indisputably occurred in Walton County. Further, the conspiracy to possess

cocaine charge required an overt act that occurred in Walton County, that is, that Watson drove his car there. Finally, there was no evidence adduced that a crime was committed by the conspirators in any other county, as was the case in *Osborne v. State*, supra. Therefore, a special venue charge was not required because, under the facts of this case, it was not possible for the jury to have convicted Watson for activities that took place in a county other than the one in which the prosecution was brought. Id. See also *Calloway v. State*, 247 Ga. App. 310, 315-317 (3) (542 SE2d 596) (2000). We find no error.

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*

DECIDED MARCH 28, 2011.

*Jennifer A. Trieshmann*, for appellant.

*W. Kendall Wynne, Jr., District Attorney, David E. Boyle, Anne M. Kurtz, Assistant District Attorneys*, for appellee.